DISTRICT OF MASSACHUSETTS

10/3/01

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 99-10044 REK |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| K. GLENN SHAW, | ) |  |
|  | ) |  |
| Defendant | ) |  |

### SUPERSEDING INFORMATION

The United States Attorney alleges that:

### General Allegations

At all times material to this Superseding Information, unless otherwise alleged:

### The Defendant

1.      From in or about January 1987 through in or about December 1993, **K. GLENN SHAW** was President of Medical Products Division of National Medical Care, Inc. ("MPD"), a corporate subsidiary of National Medical Care, Inc. ("NMC").

### The Business

2.      At all relevant times, NMC was a for-profit corporation engaged in the kidney dialysis business throughout the United States. NMC had a principal place of business in Waltham, Masachusetts and was owned by W.R. Grace & Co. One of NMC's subsidiaries was MPD, a Delaware corporation with a principal place of business in Rockleigh, New Jersey.

3.      NMC was engaged in the business of selling products and services associated with the medical care and treatment to patients diagnosed with end stage renal disease. ("ESRD").

1



ESRD is an irreversible and permanent impairment of kidney function requiring dialysis or kidney transplantation to sustain life. The most common form of dialysis, hemodialysis, typically involves treatments for several hours three times per week, in which the patient's blood is removed from the body, passes through a dialysis machine to remove impurities and toxins, and then is returned to the patient's body. NMC, through its corporate subsidiaries, operated over 300 kidney dialysis centers throughout the United States and provided dialysis services to over 30,000 patients.

    4.    MPD was a for-profit corporation and subsidiary of NMC that was engaged in the business of manufacturing, purchasing, distributing and selling products used in the dialysis treatments provided to ESRD patients. MPD sold dialysis related products both to dialysis facilities owned by NMC and to dialysis facilities not owned by NMC. Some of the products sold and distributed by MPD included artificial kidneys, blood lines, concentrate, and fistula needles used in dialysis treatments.

    5.    LifeChem, Inc. ("LifeChem") was a for-profit corporation and another subsidiary of NMC. LifeChem was an independent clinical laboratory located in Northvale, and later Rockleigh, New Jersey, that specialized in the performance of laboratory blood tests for patients with ESRD. MPD also sold and marketed LifeChem laboratory services to dialysis facilities owned by NMC and dialysis facilities not owned by NMC.

### The Medicare Program

    6.    In 1965, Congress enacted Title XIII of the Social Security Act ("Medicare" or the "Medicare program") authorizing the federal government to pay for the costs of certain medical care and services, including clinical laboratory blood testing services for persons aged 65 and

older and for persons with disabilities. The monies set aside by Congress to pay for the necessary medical care of these elderly or disabled Americans, as well as any premiums paid by such persons, are referred to throughout this Superseding Information as the Medicare Program Trust Funds.

7. In or about October 1972, Congress extended the coverage of the Medicare program to include paying, under most conditions, for the costs of medical services and care for persons suffering from ESRD regardless of the person's age.

8. The Department of Health and Human Services was an agency of the United States and was responsible for the funding, administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration ("HCFA"), was a division of that agency of the United States and was directly responsible for the administration of the Medicare program. HCFA, in discharging those responsibilities, contracts with private insurance companies, known as "carriers" or "intermediaries" to receive, review and pay appropriate claims for reimbursement for the provision of clinical laboratory services to Medicare program beneficiaries.

9. LifeChem was an approved provider for Medicare and was authorized to submit directly to the carriers under contract with HCFA lawful claims for reimbursement of laboratory blood tests performed for Medicare beneficiaries. LifeChem submitted all of its claims for payment to Pennsylvania Blue Shield, and later Xact Medicare Services, located in Camp Hill, Pennsylvania. Pennsylvania Blue Shield and Xact Medicare Services were carriers under contract with HCFA.

10. For ESRD patients who received dialysis treatments at Medicare approved dialysis facilities, Medicare established a composite rate payment that was paid directly to the dialysis facility that included the costs of care and treatment of ESRD patients. The dialysis facilities to which MPD sold products and services were required, as part of obtaining the composite rate payments from Medicare, to provide annual certifications of the expenses of providing care, pursuant to 42 CFR §§ 405.541(f) and 405.2133. These certifications of expenses were known as "cost reports."

11. As part of the submission of costs reports, dialysis facilities were required to certify that the information provided to Medicare was "true, correct and complete." Part of the required expense information included the costs of supplies and laboratory services, costs which were required to reflect the true expenses, including off-invoice payments or discounts from a supplier of products and services. The cost reports were used by HCFA as part of the basis for setting the composite rate payment that was then made to the dialysis facilities for each dialysis treatment.

## Health Systems Management

12. One of the dialysis businesses to which MPD sold hemodialysis products and laboratory services was Health Systems Management of Tifton, Georgia, which operated several individual dialysis clinics in the southeastern area of the United States. Two of those clinics purchased hemodialysis products from MPD and laboratory business from LifeChem.

13. In the fall of 1992, MPD believed the business from the two clinics operated by Health Systems Management business was in jeopardy of being lost to the competition. To maintain the business, MPD offered and paid approximately $5,000 for a bear hunting trip to

Canada for the President of Health Systems Management, an off-invoice payment.

14. During each calendar year, the dialysis facilities owned and operated by Health Systems Management were required to submit cost reports to the Medicare program. The approximately $5,000 in "off-invoice" monies paid for the hunting trip for the President of Health Systems Management were not reflected on the cost reports for the dialysis facilities in connection with the purchase of products from MPD or laboratory services from LifeChem. As a result, the cost reports to Medicare by those dialysis clinics contained a material false statement that the expenses summarized on the cost reports were "true, complete, and accurate."

15. By providing the payment to Health Systems Management for the hunting trip outside the invoice for the cost of dialysis products or laboratory services, the defendant **K. Glenn Shaw** knowingly and willfully caused the false statement to be made by the dialysis clinics in the costs reports submitted to the Medicare program in connection with the furnishing by the dialysis clinics of dialysis treatments to ESRD patients, which cost reports were used by Medicare in setting the composite rate payments for each dialysis treatment.

**COUNT ONE:**     (42 U.S.C. § 1320a-7b(a)(ii) – False Statements by Another)

16.     Paragraphs 1 through 15 of this Superseding Information are realleged as if fully set forth herein and incorporated in full.

17.     From in or about October 1992 through in or about December 1993, the exact dates being unknown to the United States Attorney, in the Districts of Massachusetts, New Jersey, Georgia, and elsewhere in the United States, the defendant

**K. GLENN SHAW**

knowingly and willfully caused a false statement of material fact to be made by dialysis facilities owned and operated by Health Systems Management of Tifton, Georgia, regarding their expenses for purchasing hemodialysis products from MPD and laboratory services from LifeChem in those dialysis facilities' cost reports that were submitted to Medicare in connection with the furnishing by those dialysis clinics of dialysis treatments to ESRD patients, which cost reports were used in setting the composite rate payment for each dialysis treatment provided by the dialysis clinics, all in violation of 42 U.S.C. § 1320a-7b(a)(ii).

Respectfully Submitted
MICHAEL J. SULLIVAN
United States Attorney

SUSAN G. WINKLER
Assistant U.S. Attorney